```
 1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                      )
      Sophia Wilansky,                  ) File No. 18-CV-316
 4                                      )          (WMW/TNL)
                Petitioner,             )
 5                                      )
      vs.                               ) St. Paul, Minnesota
 6                                      ) May 29, 2018
      United States of America; Gary    ) 10:04 a.m.
 7    Lee Delorme, in his official      )
      capacity as Assistant United      )
 8    States Attorney for the District  )
      of North Dakota; Brian James      )
 9    Vanoosbree, in his official       )
      capacity as Special Agent of the  )
10    Federal Bureau of Investigation;  )
      and Christian Gregory Freichels,  )
11    in his official capacity as       )
      Special Agent of the Federal      )
12    Bureau of Investigation,          )
                                        )
13              Respondents,            )
                                        )
14    and                               )
                                        )
15    Morton County, North Dakota       )
                                        )
16              Intervenor.             )
                                        )
17    ------------------------------------------------------------

18

19          BEFORE THE HONORABLE WILHELMINA M. WRIGHT
               UNITED STATES DISTRICT COURT JUDGE
20
                       (MOTIONS HEARING)
21

22

23

24
          Proceedings recorded by mechanical stenography;
25    transcript produced by computer.
```

1      <u>APPEARANCES</u>

2      For the Petitioner:        Madel, PA
                                  MATTHEW J.M. PELIKAN, ESQ.
3                                 Suite 800
                                  800 Hennepin Avenue
4                                 Minneapolis, Minnesota 55403

5                                 Williams & Connolly, LLP
                                  BENJAMIN M. STOLL, ESQ.
6                                 725 12th Street Northwest
                                  Washington, D.C. 20005

7
       For the Respondents:       U.S. Attorney's Office
8                                 CRAIG R. BAUNE, ESQ.
                                  600 U.S. Courthouse
9                                 300 South Fourth Street
                                  Minneapolis, Minnesota 55415

10
       For the Intervenor:        Bakke, Grinolds, Wiederholt
11                                RANDALL J. BAKKE, ESQ.
                                  300 West Century Avenue
12                                Bismarck, North Dakota 58502

13     Court Reporter:            LORI A. SIMPSON, RMR-CRR
                                  Suite 146
14                                316 North Robert Street
                                  St. Paul, Minnesota 55101

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2                    **IN OPEN COURT**

3              LAW CLERK:  Your Honor, the matter on the case

4     [sic] is 18-CV-0316, Sophia Wilansky vs. United States of

5     America, et al., here on a motion to dismiss.

6              THE COURT:  Thank you.  Counsel, please note your

7     appearances.

8              MR. STOLL:  Benjamin Stoll from Williams &

9     Connolly for Petitioner Sophia Wilansky.

10             THE COURT:  Thank you.

11             MR. PELIKAN:  Matthew Pelikan from Madel, PA for

12    Sophia Wilansky.

13             THE COURT:  Thank you.

14             MR. BAUNE:  Craig Baune, Assistant United States

15    Attorney, on behalf of the respondents.

16             THE COURT:  Thank you, Counsel.

17             MR. BAKKE:  Randall Bakke on behalf of Intervenor

18    Morton County from Bakke, Grinolds, Wiederholt law firm in

19    Bismarck, North Dakota.

20             THE COURT:  Thank you.  Counsel, are we ready to

21    proceed?  And I also will ask about how you will be arguing

22    this morning since there are four counsel.

23             MR. STOLL:  Sure, Your Honor.  We talked about

24    this earlier and I think we've reached an agreement.

25    Petitioner will start and will give the opening argument.

1    Then the federal government and respondents will give their

2    argument.  Then Morton County.  And then we can have a

3    reply, as you would see fit, from the petitioner and then

4    also a second reply, if you see fit, from the federal

5    government.

6              THE COURT:  Very well.  Thank you, Counsel.  You

7    may proceed.

8              MR. STOLL:  Thank you, Your Honor.  We are here

9    today on a Rule 41(g) motion filed by Sophia Wilansky.

10   Sophia seeks the return of shrapnel that was seized from her

11   body by the federal government and clothing that was seized

12   from her by the federal government.

13              I would note at the outset that it seems like the

14   biggest contention here is over the shrapnel, so I am

15   largely going to argue here about the shrapnel, but my

16   arguments here apply with equal force to the clothing and we

17   can discuss that separately if you would like to do so.

18              THE COURT:  Okay.

19              MR. STOLL:  On a Rule 41(g) motion I think the key

20   issue is reasonableness.  And the Court is being asked here

21   to balance the reasonableness of how long the government has

22   had Sophia's possessions, in particular the shrapnel,

23   against the need that she has to get those items back.

24              And what I would submit to you is that the

25   government has now had the shrapnel for more than a

1    reasonable amount of time and you can see that in the fact

2    that similar cases have held that holding items for 17, 18

3    months, similar to what we see here, if not less, is plenty

4    of time for the government and at that point the government

5    is asked to return those possessions to the petitioner in

6    these type of motions.

7          The government has essentially argued that it has

8    an ongoing criminal investigation here and that's why it

9    needs to keep the shrapnel, but I think the language in the

10   *Black Hills* case from the Eighth Circuit is instructive

11   because that was a case that also involved a situation where

12   the government was claiming an ongoing investigation and

13   what the Eighth Circuit said there is that the government

14   may retain seized goods for a reasonable time while the

15   investigation and prosecution proceed.

16         So the Eighth Circuit there was sort of

17   acknowledging the fact that even in a situation of a

18   proclaimed ongoing investigation, the government is only

19   allowed to hold a private citizen's property for a

20   reasonable amount of time.  And here the government has held

21   it for more than a year before Sophia filed this motion and

22   we're now at the point where it's been about 18 months.

23         You know, Sophia is at a bit of disadvantage here

24   because I can't see what the government wrote in its

25   *ex parte* brief to you where it provided its explanation of

1      why this investigation is still going, but there are public

2      indicia of the fact that this investigation has been going

3      on too long at this point.

4           It's not a complicated case.  There were numerous

5      law enforcement eyewitnesses.  The government secured the

6      relevant evidence within days of Sophia's injury.  They

7      began testing that evidence within days of Sophia's injury,

8      and they have now admitted and conceded that they are done

9      testing the evidence.  So it seems that the only reasonable

10     thing to do here is to return that evidence to the

11     petitioner.

12          On the other side of the ledger, I think Sophia's

13     need for the shrapnel and the clothing is extremely high

14     here.  Number one, she continues to suffer an extreme

15     reputational detriment from the fact that various government

16     agents have insinuated that she participated in making

17     explosive devices for use against law enforcement, something

18     that the media has picked up on and published national

19     stories about.  So she has this horrible reputational cloud

20     hanging over her head.

21          THE COURT:  And how does the shrapnel relate to

22     that, the possession of the shrapnel relate to that?

23          MR. STOLL:  She needs the shrapnel to test it to

24     establish that it didn't come from the type of propane

25     device that the government is asserting she was attempting

1    to make.

2            So the other sort of need that she has for this

3    evidence --

4            THE COURT:  What about the clothing?  Is it the

5    shrapnel -- I mean, you've focused on the shrapnel.  The

6    same arguments, do they pertain to the clothing and are you

7    using them as synonymous?

8            MR. STOLL:  Yes, I think the shrapnel is likely to

9    be more probative on these matters, but her clothing may

10   have residues on it and the way that the clothing was

11   destroyed could be indicative of the type of item that

12   caused her injury.

13           So just as an example, if you had an explosion

14   that produced a lot of heat, you would expect charring of

15   the coat and sort of evidence of fire damage.  So looking at

16   her clothing and seeing whether that existed would be

17   probative of how she was injured.

18           THE COURT:  And does she seek possession or

19   inspection?

20           MR. STOLL:  You know, I think in the first

21   instance she would seek possession, but she --

22           THE COURT:  Why?

23           MR. STOLL:  There's a good reason for that, Your

24   Honor, and that is having never gotten a chance to see these

25   items yet, it is a little hard at this stage for us to

1    anticipate sort of how many times we're going to need to

2    analyze it, what kind of analysis we're going to need to

3    perform and so --

4            THE COURT:  So why wouldn't that require or bode

5    for an inspection so that you can better refine your

6    arguments and make them persuasively?

7            MR. STOLL:  In the first instance we would be very

8    happy if Your Honor ordered the government to allow Sophia's

9    expert to inspect the items.  In fact, if the order was

10   written such that Sophia's expert had reasonable access to

11   the item, I think we would be fine with it remaining in the

12   government's possession.

13           I will say that the *Black Hills* case sort of

14   addresses the question of when the government wants items as

15   evidence, what to do about a petitioner who would like the

16   items returned and they talk about an example where the

17   government seizes a getaway car and the owner of that car

18   wants that car returned.

19           What the *Black Hills* court says in that case is

20   that the government is only allowed to hold the car for a

21   reasonable amount of time.  After that point the government

22   can lift fingerprints from the car, dust the car for other

23   evidence, they can take pictures of the car.  They can do

24   what it needs to do to gather the evidence it needs, but

25   then it needs to return the car.

1           And I think that's instructive here because that's

2     a situation in which the criminal defendants, the supposed

3     bank robbers, would clearly want to test the car themselves

4     to try to show that the government, you know, didn't lift

5     the prints correctly and whatnot.  But the court doesn't say

6     that.  The court doesn't say the government is allowed to

7     keep the car.  The court says the government has to take its

8     evidence from the car, preserve that evidence, and give the

9     car back.

10          THE COURT:  And so the analogous evidence in this

11    case would be what?

12          MR. STOLL:  Would be the shrapnel.  So the

13    government has conceded that it's already completed its

14    testing of the shrapnel.  If there are residues on the

15    shrapnel, presumably they've tested those residues to see

16    what they're made out of.  They've tested the chemical

17    composition of the shrapnel.  I mean, I'm not 100 percent

18    sure of exactly what tests the government has conducted, but

19    presumably they have all those lab results and they can keep

20    those lab results and those lab results are what they would

21    eventually use, presumably, as evidence in a trial.

22          I mean, the shrapnel at issue here is a

23    one-millimeter square piece of metal.  It's not the kind of

24    thing that's a terribly compelling piece of sort of physical

25    evidence in its own right.  What's relevant is the tests

1    that are conducted on it.

2            THE COURT:  Really?

3            MR. STOLL:  Well --

4            THE COURT:  I mean, I've sat through enough trials

5    to know that having someone talk about an object versus

6    having the object before you has a different impact upon the

7    fact-finder in a given case.  So I'm intrigued by that

8    argument.

9            MR. STOLL:  Understood, Your Honor.

10           THE COURT:  I certainly understand the need to

11   preserve evidence, but I'm curious about your argument.

12           MR. STOLL:  Sure.  I would make two points about

13   that, Your Honor.  The first is that in our briefing we've

14   already acknowledged that if the government really needs the

15   actual piece of shrapnel for a trial, we are more than happy

16   to voluntarily make that piece of shrapnel available to them

17   for the trial.  So, I mean, we will give it back to the

18   government on a limited basis if the government needs it for

19   a reason.

20           And so I think, you know, even if you think that

21   the shrapnel is a compelling piece of evidence in its own

22   right, the government doesn't have -- we don't have a

23   problem supplying it to the government.

24           THE COURT:  Okay.

25           MR. STOLL:  Would you like me to go through any of

1    the jurisdictional factors, Your Honor, or are you happy

2    with the briefing on that?

3           THE COURT:  I am going to let you present your

4    argument as you see fit.

5           MR. STOLL:  Okay, Your Honor.  So in addition to

6    the sort of reasonableness analysis, which is, I think, the

7    heart of the Rule 41(g) inquiry, there are also these four

8    factors that the Eighth Circuit instructs the courts to look

9    at to determine whether exercise of jurisdiction is proper

10   here and those factors do, I think, significantly overlap

11   with the merits analysis, but those factors are whether

12   there was a disregard of the petitioner's constitutional

13   rights in the seizure, whether there was irreparable injury

14   to the petitioner, whether the petitioner had a possessory

15   interest in the shrapnel, and whether the petitioner has a

16   viable alternative remedy to a Rule 41(g) motion.

17          And I would say on the disregard of constitutional

18   rights prong, that's largely, I think, the same as the

19   reasonability analysis on the merits.  For purposes of this

20   motion we're not disputing the original seizure of it.  The

21   constitutional harm or the constitutional disregard here

22   comes from the fact that the government has since retained

23   the shrapnel now for an unreasonable period of time.

24          THE COURT:  So if I understand your argument,

25   there's no contest as it relates to obtaining a grand jury

1    subpoena for the evidence?

2              MR. STOLL:  Sorry, Your Honor.  I didn't hear

3    that.  Can you say it again?

4              THE COURT:  No contest as to obtaining a grand

5    jury subpoena for the evidence, for the shrapnel?

6              MR. STOLL:  For purposes of this motion we are not

7    disputing the propriety of the grand jury subpoena.

8              THE COURT:  And so it's just the length of

9    retaining the evidence that you are contesting?

10             MR. STOLL:  For purposes of this motion, correct,

11   Your Honor.

12             THE COURT:  Okay.

13             MR. STOLL:  On the irreparable harm prong, I think

14   I've largely covered the main points on that as well.

15   Sophia is suffering from a reputational ongoing harm as a

16   result of these sort of media stories and these accusations

17   by law enforcement.  She needs to clear her name and she

18   needs the shrapnel to help her clear her name.

19             The other thing I would say is that Sophia has

20   amassed significant medical bills and other financial

21   obligations related to her injury and she would like to seek

22   financial redress of that.

23             THE COURT:  How do we think about the statute of

24   limitations for the United States' case as it relates to the

25   appropriate length of time that one should maintain control

1     and custody over the property?

2            MR. STOLL:  I would say, Your Honor, that the

3     statutes of limitations are generally made to be long enough

4     that the government should not have trouble in an ordinary

5     case, certainly a case like this, conducting its

6     investigation and bringing its indictments or closing its

7     investigation within the amount of time necessary to return

8     the property so that the petitioner can file her legal

9     actions before the statutes run.

10            So in this particular case, just as an example, a

11    defamation suit in Morton County would have a two-year

12    statute of limitations.  If the government conducted a

13    year-long investigation, which I think is, frankly, a long

14    time for an investigation like this, completed its

15    investigation and returned the shrapnel, the petitioner

16    would have plenty of time, a year, to analyze the shrapnel

17    and use it as part of a defamation suit.

18            THE COURT:  What about a criminal case, what would

19    the statute of limitations be for that?

20            MR. STOLL:  In terms of something that the

21    government would bring?

22            THE COURT:  Yes.

23            MR. STOLL:  Against whom?

24            THE COURT:  Against your client.

25            MR. STOLL:  Well, again, I think that -- if the

1    government thinks that there was a private citizen who was

2    responsible for Sophia's injury, I think a year is plenty of

3    time in this particular situation for the government to

4    investigate that and to issue an indictment or arrest

5    somebody.

6              THE COURT:  And so we don't look to the statute of

7    limitations as a governor at all?

8              MR. STOLL:  Oh, in terms of the statute of

9    limitations on the government's side?  I'm sorry.

10             THE COURT:  Right.

11             MR. STOLL:  I think it would be a relevant factor,

12   but in this kind of situation I don't think it's

13   dispositive.

14             THE COURT:  I mean, they have more than one case

15   to bring theoretically and so I'm just trying to get a sense

16   of how we look at a statute of limitations and whether we

17   look at it at all as it relates to whether or not the

18   evidence that might be used in the course of a proceeding

19   has been held too long.

20             MR. STOLL:  Understood, Your Honor.  I'm not aware

21   of any case law where the courts have looked at the

22   government's statute of limitations as a factor in deciding

23   whether the investigation was reasonable.  I do think that

24   in the appropriate circumstances that could be relevant.  I

25   think that would be more relevant in a case where you had a

1    very complicated investigational process going on.

2         THE COURT:  I'm going to stop you there just

3    because you say a year, well, is enough, but theoretically

4    the evidence may be needed for longer than a year and the

5    statute of limitations would permit a case to be brought for

6    longer than a year after the evidence was seized, correct?

7         MR. STOLL:  That's correct, Your Honor, but what I

8    would say is what I think *Black Hills* instructs is that in a

9    situation where you have a long ongoing investigation, the

10   courts are asked to look at reasonable substitutes for the

11   government holding a private citizen's possessions for an

12   indefinite period of time and those substitutes are lab

13   results, photos, other sort of forensic evidence that are

14   gathered from the actual item rather than holding the item

15   itself.

16        And I think the case law across the circuits is

17   relatively consistent on the fact that once you start

18   approaching a year and a half, the courts start saying,

19   look, it's time to return the possessions, Government, you

20   need to use other substitutes.

21        THE COURT:  What's the nature of those possessions

22   in that year-and-a-half range?

23        MR. STOLL:  It is often cash or business

24   documents.

25        THE COURT:  Which can be copied.  So you would say

1    this is the equivalent of cash or business documents, which

2    can be photographed, and therefore you don't need to

3    maintain physical control over the shrapnel itself?

4         MR. STOLL:  I think there are strong similarities

5    to that.  I do think that there are sort of -- I would

6    concede that there are complexities to this particular type

7    of shrapnel that aren't there for a business record or cash,

8    but there are cases that address that as well.

9         So I think *Black Hills* is particularly instructive

10   on that because in that case you have these dinosaur bones,

11   which really are relevant as the actual bones themselves and

12   the various forensic evidence that can be lifted from them,

13   and what the court said about those bones after only a month

14   is the government needs to return them, but before the

15   government returns them they can take whatever steps are

16   necessary to establish proof of the evidence before they

17   return them.

18        So the government [sic] is acknowledging that, you

19   know, even in situations where the item that the petitioner

20   wants back is itself the critical piece of evidence, there

21   are alternatives to just letting the government hold that

22   item indefinitely.  I think the example of the getaway car

23   is another way that the *Black Hills* court is trying to

24   discuss that issue.

25        THE COURT:  And here there was a grand jury

1   subpoena, correct?

2          MR. STOLL:  There was a grand -- my understanding

3   is that there was a grand jury subpoena issued to the

4   hospital for the shrapnel.

5          THE COURT:  Okay.  And so that means that the

6   grand jury is conducting an investigation.  How do we get

7   insight -- given the secret nature of the grand jury, how do

8   we get insight that protects that investigative interest?

9          MR. STOLL:  Sure.  Well, certainly, Your Honor, I

10  believe that the government has supplied some of that

11  insight to you in its *ex parte* briefing.  I can't refute

12  that because I can't see it, but that is one way for you to

13  get that information.

14         I would also say that to some extent once the

15  government has had the item for well over a year, those

16  compelling circumstances regarding its investigation are

17  relevant, but they're not dispositive anymore.  After a

18  year, after 18 months the courts are instructed to tell the

19  government it has to use a substitute rather than keep the

20  actual item.

21         And lastly on that point I would say I've already

22  acknowledged that we are willing to talk about compromises

23  that allow the government to keep possession of the shrapnel

24  as long as Sophia's expert is allowed to analyze it.

25         THE COURT:  And if I were to look to an analysis

1    that requires callous disregard, what would you point to in

2    that regard as evidence or the best evidence of that?

3              MR. STOLL:   Sure.  I mean, I think that the *Black*

4    *Hills* case and the *Mr. Lucky* case are the best, sort of most

5    relevant case law on that point because they're both

6    situations in which the government had a proclaimed ongoing

7    investigation at the time that the petitioner sought the

8    return of the items and there you will see that in both

9    cases the way that the court analyzed the question of

10   callous disregard was to look at the reasonableness of the

11   length of time that the government has held the possession

12   in conjunction with the reasons the government has given for

13   why it still needs -- for why its investigation is taking so

14   long and why it still needs the evidence and what the viable

15   substitutes are.

16             And the *Mr. Lucky* case says, I think pretty

17   straightforwardly, that in a situation in which the

18   government holds private property for an unreasonable period

19   of time, you have callous disregard right there.  Even if

20   the initial seizure was proper, even if the government has

21   an ongoing investigation, there needs to be some diligence.

22             And I think a lot of that dates back to the

23   *Sovereign News* case where the court noted that the

24   government is not allowed to just hold private property in

25   the hopes that someday that property will become relevant to

1   some indictment it wants to bring.

2        There has to be some onus on the government here

3   to move with some diligent speed and to finish its

4   investigation in a reasonable amount of time.  Otherwise the

5   government has to rely on substitutes, like lab results,

6   pictures, things like that.

7        The last point -- well, on the last two prongs

8   that we haven't really discussed, Your Honor, the first

9   being an alternative remedy, I think it's pretty clear here

10  that Sophia does not have a viable alternative remedy.

11       What the courts seem to talk about in those

12  situations are whether there's a criminal proceeding where

13  the petitioner can file a motion for the return of its

14  property as part of an ongoing criminal proceeding against

15  it or a situation in which the government has filed a

16  forfeiture action and so the petitioner can use that

17  forfeiture action as a vehicle for disputing the

18  government's seizure of its property.

19       This is a situation in which the government has

20  brought no actions, certainly not against my client, and so

21  Sophia has no ability, no other avenue for disputing the

22  government's retention of her property.

23       The government's argument is that her alternative

24  is just to wait until the government decides it wants to

25  voluntarily comply with her request to return it and I don't

1    think that that is -- I don't think that's really a remedy

2    at all, but I certainly don't think it's a reasonable

3    alternative; and if it were --

4              THE COURT:  Why isn't, again, the statute of

5    limitations on any claims by the government a reasonable

6    governor?  Is it because there's the competing statute of

7    limitations that your client is concerned about?

8              MR. STOLL:  Yes.  And in other situations there's

9    also just the fact that private citizens are entitled to

10   have their private property back.  They're entitled to not

11   have the government just hold their property for

12   unreasonable lengths of time because the government, you

13   know, thinks it might be relevant to something in the

14   future.

15             THE COURT:  And at what point did the shrapnel

16   become the property interest of your client versus the

17   United States?

18             MR. STOLL:  Sure.  I don't think the United States

19   has ever had a property -- a possessory interest in the

20   shrapnel.  I think it's only wanted it for evidence.  I

21   think it became the property of Sophia when it was embedded

22   in her arm.  At that point I think it's a reasonable --

23             THE COURT:  So I'm going to go back to, okay, so

24   where do we get fee title in that instance?

25             MR. STOLL:  My understanding is that black-letter

1    property law certainly in Minnesota and I think throughout

2    the country is that the first known possessor of a piece of

3    property is presumed to be the owner of that property as to

4    everybody else who subsequently possesses it and everybody

5    else who claims an interest in it, other than those who can

6    come forward with better title.  I mean, I think that's just

7    how property interests sort of come into existence initially

8    when you have --

9              THE COURT:  So the property interest develops at

10   the point when it's lodged in a party's body?

11             MR. STOLL:  Yeah.  At that point I think she's

12   analogous to somebody who found property.  Right?  And as a

13   finder, she becomes the owner of that property unless

14   somebody else comes forward and establishes that they owned

15   the property first before it was embedded in her.

16             This is sort of a unique situation because both

17   Morton County and the federal government are trying to

18   undermine Sophia's property interest in this piece of

19   shrapnel, but neither one of them are willing to claim that

20   it's their property.  In fact, both of them have claimed

21   that it's not.  If they want to claim that it's their

22   property, that it came from their munition, I think we would

23   have a very different conversation about this.

24             And that's actually a good segue into -- well, let

25   me make one other point about Sophia's possessory interest

1   in the shrapnel.  I would say that the government has

2   already acknowledged, essentially, that Sophia does have a

3   possessory interest in the shrapnel and you can see that

4   from Sophia's father Wayne's conversations with Agent Hoff

5   and Agent Delorme -- sorry, Mr. Delorme over time.

6        And the government talks a lot about the sort of

7   notes that were scribbled on the consent to search form, but

8   what's really the point of all that from Sophia's

9   perspective is that at the time the government came to take

10  Sophia's property, Wayne stood up and he said, you know, we

11  are willing to voluntarily part with this property to aid in

12  the government's investigation as long as the government

13  agrees that it is -- that we do have a possessory interest

14  in this property and that we are entitled to have it back

15  for testing in a reasonable time frame.  And that's the

16  conversation he had with Agent Hoff, which he included in

17  his declaration.  The government in its briefing, as far as

18  I can tell, has not refuted that that is the conversation he

19  had with Agent Hoff.

20       And then every month he called Agent -- or

21  Mr. Delorme to say when are we getting the shrapnel back and

22  during those conversations Mr. Delorme acknowledged that

23  that shrapnel was covered by the general agreement with

24  Agent Hoff that the shrapnel was Sophia's, that she was

25  entitled to have access to it in a timely manner.  He just

1    refused to sort of actually abide by the agreement he

2    acknowledged existed.  I don't think that the written

3    consent form is terribly important in its --

4         THE COURT:  Why?  Why isn't it important?

5         MR. STOLL:  It was not, I think, intended to be a

6    contract.  It's not an integrated agreement where it's the

7    entire understanding between the parties.

8         THE COURT:  It's consent.  Is the consent limited?

9         MR. STOLL:  I think --

10        THE COURT:  More time limited, that's what I mean.

11        MR. STOLL:  Sorry.  Is what time limited?

12        THE COURT:  Is the consent time limited?

13        MR. STOLL:  Yeah.  I would say that the

14   understanding was that the consent to the government having

15   the shrapnel and the clothing was limited by the government

16   finishing with it in a reasonable time frame or at least

17   make it accessible to Sophia in a reasonable time frame.

18        THE COURT:  So "finished with it" would make me

19   think that we're looking at a statute of limitations.

20        MR. STOLL:  I don't think that Wayne or Agent Hoff

21   were thinking in that level of detail at the time that they

22   were sort of reaching this oral agreement.

23        I mean, Wayne was under extraordinary distress

24   here.  His daughter was being prepped for surgery and he had

25   a whole team of FBI agents sort of outside her hospital room

1    that was making it difficult for medical personnel to get

2    her into surgery.  He needed to do something very quickly

3    and so he said, you know, I'm willing to be reasonable, I'm

4    willing to help in this government investigation, but I want

5    some assurances that I'm not giving away my rights to this

6    property on behalf of my daughter.  And I think that the

7    government hasn't followed through on the principle behind

8    that agreement.

9            But I think the -- Sophia's right to the clothing

10   and the shrapnel in terms of it being her property would

11   exist even if there had been no agreement with the

12   government.

13           So even if the government had come in and had

14   taken all that stuff pursuant to a search warrant and a

15   grand jury subpoena and had never talked to Wayne about it,

16   I think we would still be here today and I would still be

17   making this exact same argument, that the government has had

18   these items for too long, that they --

19           THE COURT:  Too long being how long?

20           MR. STOLL:  Certainly 18 months.  I think, you

21   know, the cases that I have seen on this, the longest that I

22   have seen is about 18 months.

23           So we filed -- patiently waited a year

24   specifically to give the government a full year to conduct

25   its investigation and then we filed this suit with an

1    understanding that it would take some time to brief it and

2    to have an oral argument and for Your Honor to reach a

3    decision about it and that would get us to the point where

4    we are at 18, 20, you know, months and at that point we

5    really -- we're up against a wall because we have a two-year

6    statute of limitations on a defamation case.  So, you know,

7    Sophia waited, I think, as long as she reasonably could

8    before bringing this action.

9           THE COURT:  So the statute of limitations that I

10   should focus on for how long is too long is the defamation,

11   not any other statute of limitations, from your client's

12   perspective?

13          MR. STOLL:  It's the most important, Your Honor,

14   because it's the shortest, but there are others.  I believe

15   that certain common law tort actions in North Dakota would

16   have a three-year statute of limitations.

17          THE COURT:  And help me just understand with

18   precision the relationship between this evidence and a

19   defamation claim.

20          MR. STOLL:  Sure.  So in a defamation case that

21   Sophia would bring against, you know, the people who are

22   defaming her, part of establishing that defamation action

23   would be establishing that the accusations against her are

24   false.  The shrapnel would be highly probative of that.

25          THE COURT:  Probative of?

1              MR. STOLL:  The falsity of the accusations.

2              So Sophia gets injured.  Law enforcement agents

3      come forward and insinuate or state that she was injured by

4      a propane tank explosion.  That propane tank was being built

5      by protesters, potentially including Sophia herself.  And so

6      therefore this gruesome injury is the fault of protesters

7      who are essentially creating bombs to use against law

8      enforcement.

9              If the shrapnel comes back and it's made of the

10     same material as, for example, a flash-bang or a CS grenade

11     and the composition of the shrapnel is not consistent with a

12     propane tank, I think that goes a long way to establishing

13     that the accusation made by law enforcement is objectively

14     false.

15             THE COURT:  Was she in possession or control of

16     the propane tank?

17             MR. STOLL:  I'm not sure that there were any

18     propane tanks, Your Honor.  Sophia certainly didn't have any

19     and was not participating in any use of propane tanks.

20     There were a lot of propane tanks around the area because

21     this was the middle of winter and propane tanks were a

22     primary source of heat for the protesters.

23             THE COURT:  And the shrapnel, you think, came from

24     that?  I'm just trying to track your argument.

25             MR. STOLL:  We are trying to figure out where the

1      shrapnel came from.

2                 THE COURT:   Okay.

3                 MR. STOLL:   That's why we would like to have it

4      back.  My best understanding at this point is that the

5      shrapnel came from some type of less lethal munition that

6      was being used by law enforcement in the area around the

7      time of Sophia's injury.  I'm not exactly sure what

8      particular munition it was, but that's why we have hired a

9      forensic chemist who has a lot of experience dealing with

10     less lethal munitions and artifacts from explosions and has,

11     you know, worked closely with law enforcement.

12                She's in a position to look at this and to say,

13     you know, this could have come from a flash-bang, this could

14     have come from a tear gas grenade, something like that.  She

15     would also be in a position to say whether or not it came

16     from a propane tank.

17                THE COURT:   And why couldn't she plead her case

18     without the shrapnel?

19                MR. STOLL:   She could file suit without the

20     shrapnel, but as I think we mentioned in our brief, I mean,

21     I think it's inevitable that the government is going to

22     claim qualified immunity and put up the same hurdles that

23     you're seeing today to letting Sophia have access to and

24     test the property that's in the government's possession.

25                So what we're trying to do is we're trying to get

1      all the evidence we can get before we file a suit.  Before

2      we make public legal accusations against the government

3      about something, we want to have all the available evidence

4      to do that.

5              If our motion was denied here and Sophia was

6      denied even access to testing the shrapnel, what's going to

7      happen is, you know, in the next couple of months some kind

8      of civil lawsuit is going to get filed and we're going to be

9      right back here having the same argument but under sort of

10     discovery rules rather than under Rule 41(g).  That seems

11     inefficient.  I mean, in a world in which it came back and

12     the shrapnel was definitively not --

13             THE COURT:  There would be something to tether it

14     to and so while you may think it's inefficient because it

15     takes longer or requires more legal resources, at least

16     there is a claim to tether it to.  There is a doctrine about

17     discovery that would be a means to tether the analysis to.

18     There would be less speculation about the relevance of this

19     evidence and the need for discovery for it.

20             MR. STOLL:  Your Honor, I would say that I think

21     there is both a clear tether and a clear doctrine here.  I

22     mean, I think Rule 41(g) is a very clear doctrine about how

23     courts look at these situations and the tether here is that

24     the items are Sophia's property.

25             She's a private individual.  She is entitled to

1     the return of her private property.  And I think that she's

2     entitled to that even if she's not intending to file any

3     lawsuits against anybody, even if there wasn't any question

4     of, you know, whether this is going to end up being

5     probative of a 1983 action or not.

6              There's a real significant value here in her just

7     having the shrapnel so that she can test it so that she can

8     find out and get definitive proof for herself and for the

9     public of what caused her injury.

10             I mean, she's operating under both some lack of

11    knowledge herself of how she was injured and who was

12    responsible for that and what type of munition injured her,

13    and she's also under this reputational cloud that she needs

14    the shrapnel to clear up.  I think those establish her

15    irreparable harm, which is a prong to the jurisdictional

16    inquiry.

17             But the question of on the merits whether she gets

18    the property back or whether she gets access to it doesn't

19    require her to show that she needs it for some legal

20    purpose.  It just requires her to show that it is her

21    property and the government has had it for too long, and I

22    submit to you that both of those two things are true here.

23             Thank you, Your Honor.

24             THE COURT:  Thank you, Counsel.

25             MR. BAUNE:  May it please the Court.

1          The plaintiff seeks to require the government to

2     hand over evidence to her that's central to an ongoing

3     criminal investigation for her use in preparation for a

4     civil case that she has not yet brought.

5          Under those circumstances the Court should deny

6     her motion for return of property and dismiss this case for

7     lack of equitable jurisdiction because she cannot make the

8     extraordinary showing required for the Court to exercise

9     such equitable or, as it's sometimes called, anomalous

10    jurisdiction.

11         THE COURT:  So ongoing civil investigation --

12         MR. BAUNE:  I apologize.  If I said civil, I

13    meant --

14         THE COURT:  I'm sorry.  Criminal.  You did say

15    criminal.  Ongoing criminal investigation.  So I am looking

16    at a six-year statute of limitations for that?

17         MR. BAUNE:  That is my understanding.  I don't

18    believe I can say with precision what potential charges

19    there are without violating grand jury disclosure, but I

20    believe we are looking at a five- or six-year statute of

21    limitations.

22         THE COURT:  Okay.  And the civil statute of

23    limitations?

24         MR. BAUNE:  The civil statute of limitations is

25    unclear because the moving documents -- the petition and the

1    briefing says that they may potentially have civil claims

2    with a two-year statute of limitations, but until today they

3    haven't said what those statutes of limitations are.

4         THE COURT:  And sometimes you need to do your

5    investigation before you file your lawsuit and plead your

6    claims in a complaint.  Certainly judges appreciate that

7    level of pre-complaint discovery and investigation.  And I

8    hear plaintiff saying that that's really -- that the

9    position that the United States is taking is getting in the

10   way of it being able to plead with precision and in a timely

11   fashion.

12        MR. BAUNE:  Well, plaintiffs have to date not been

13   shy about saying either in pleadings and in the public what

14   they think happened.  They've made a pretty clear argument

15   that they believe that law enforcement fired less lethal

16   ammunition at her and that that caused an explosion and that

17   caused the shrapnel to be lodged in her arm.  That's

18   essentially what they pled in this case.  So I don't know

19   why they would need to wait for further investigation to

20   plead it in another case.

21        And more to the point, though, first of all, they

22   do have -- even if a two-year statute of limitations

23   applied, they still have six months between now and then

24   and this investigation, although it hasn't been charged yet,

25   I mean, there could be a conclusion to the investigation in

1    the interim where either charges are filed or where the

2    investigation closes.  At that point either criminal

3    discovery would kick in or the government would no longer

4    have a reason to hold the property.  But beyond that --

5              THE COURT:  And you can waive that statute of

6    limitations?

7              MR. BAUNE:  I'm sorry?

8              THE COURT:  You could waive that statute of

9    limitations?

10             MR. BAUNE:  I don't know that the government could

11   waive that statue --

12             THE COURT:  So they are supposed to just hope and

13   pray that the government acts in a timely fashion that

14   facilitates their lawsuit such that they can file it within

15   the statute of limitations?

16             MR. BAUNE:  Well, there's, I guess, a two-part

17   answer to that.  One is there is time left.  Irreparable

18   harm is not the notion that they have just -- that they may

19   suffer irreparable harm at some point.  I think they need to

20   be closer to their statute of limitations before they have

21   hit irreparable harm and that's only if you assume that they

22   need to have the property in order to file their civil case.

23             But the bigger problem for them than that is that

24   civil cases are filed all the time without parties having

25   access to all the evidence in advance.  It would be -- I am

1     sure it would be helpful for them to have that, but it is

2     not required to have all the evidence before you file a

3     civil case.  That's what civil discovery is for.

4              THE COURT:  So the government's position is that

5     it would waive all of these arguments in the course of civil

6     discovery?

7              MR. BAUNE:  That is not my position.  I don't know

8     for sure that the federal government would be a defendant,

9     so I don't know that I can make a claim as to what would be

10    waived.

11             I think we would be talking about 1983 claims,

12    defamation claims to the extent that they're against

13    primarily, if not exclusively, state and local actors.  And

14    if there were a claim against federal actors, it would have

15    to be a *Bivens* claim.  It wouldn't be a claim against the

16    federal government itself.

17             I can't at this point -- a *Bivens* claim is an

18    individual capacity claim against those individuals who are

19    involved.  So at this point I'm not representing any of

20    those individuals.  There's been no suit.  There's been no

21    finding.  So I can't say what would be waived or not waived

22    by the federal government or federal defendants in such a

23    case.

24             But if such a claim were filed within two years,

25    again, a motion to dismiss, whether it be *Bivens* or whether

1    it be qualified immunity or whatever it may be, a motion to

2    dismiss is a motion on the pleadings.  It's not a motion

3    based on the evidence.

4         So the government or whoever the defendant is

5    couldn't move to dismiss and say they don't have the

6    evidence, they don't have the testing done.  There's a fact

7    dispute.  There's a factual issue that they haven't proven.

8    What it would be looking at is the pleadings alleged in the

9    complaint.  And if there's a qualified immunity defense,

10   it's not one based on lack of development of the facts.

11   It's one based on the complaint as pled.

12        So she can file a civil case without the need for

13   that property and she could even -- if there were a motion

14   to dismiss, she wouldn't really need the property until that

15   case got into discovery.

16        THE COURT:  Can she identify the proper defendant

17   without the evidence?

18        MR. BAUNE:  It depends on what her claims are.  If

19   she's talking about a 1983 claim, I'm not sure that has a

20   two-year statute of limitations and I don't think they've

21   said that it does.  If they are talking about a defamation

22   claim, then they would need to know -- it's based on who

23   made the statement that is allegedly defamatory.

24        So, you know, as far as a 1983 claim, I don't

25   think that we've crossed that bridge yet where she has to

1    file or even approach that bridge where she has to file

2    that, as far as I know, at least as far as what she's

3    alleged.

4         But I'm not saying that she can never hit the

5    point of having irreparable harm, but I am saying it would

6    have to be after a complaint is filed and any motion to

7    dismiss occurs that she starts to have a need for the

8    evidence.  At that point is when she needs the physical

9    evidence, not now.

10        I agree that it would be -- I can understand why

11   she would like to have it now, why it would be helpful to

12   her, but she is not irreparably harmed by not having access

13   to the evidence today and that's the standard that's

14   necessary for the Court to invoke equitable or anomalous

15   jurisdiction to hear this case.  She has not made -- is not

16   there yet.

17        And I point out that the Eighth Circuit has held

18   that the court's authority to order the return of property

19   under such circumstances is extraordinary and is to be

20   exercised with caution and restraint.  So for that reason

21   it's appropriate to insist upon irreparable harm and there

22   being a showing of irreparable harm now rather than to take

23   the plaintiff's argument that it would be inefficient and

24   that it would merely be helpful now.  That doesn't get them

25   far enough for the court to exercise equitable jurisdiction.

1          The other argument that the petitioner made in

2     terms of arguing that she's suffering irreparable harm is

3     the need to clear her name.  Now, that argument has been

4     directly addressed by the Eighth Circuit in the *4801 Fyler*

5     case in which a potential defendant said he needs access to

6     the evidence in order to clear his name.  The Eighth Circuit

7     said that doesn't qualify as irreparable harm.  The Eighth

8     Circuit said it understands that is a harm.  We can't let

9     that one count because jurisdiction to hear these kinds of

10    pre-trial or pre-indictment motions for return of property

11    is extraordinary and if we held that potential defendants

12    get access to property in order to clear their name, we

13    would make that ordinary, it would happen all the time.  The

14    *4801 Fyler* case is directly on point and directly refutes

15    that claim.

16          Now, I would like to speak -- I think that all

17    goes to irreparable harm.  I would like to speak to another

18    one of the factors, which is the government's retention of

19    the evidence.  I think the key here is the petitioner is

20    highlighting it as if it's a pure timing analysis.  And it's

21    more than that.

22          The reason that the government is holding the

23    evidence is important and it's an important consideration.

24    The government is holding it here as evidence for a couple

25    of reasons.

1          One is, as the Court has suggested, of course the

2     government would want to introduce, in all likelihood, the

3     shrapnel itself at trial.

4          There's another issue that makes this, I think,

5     distinguishable from a lot of other cases and that is the

6     issue is the shrapnel is very sensitive evidence.  The

7     question is not only what is it made out of, but what

8     residues are on it.

9          And for that reason any -- allowing anyone to have

10    access to the shrapnel itself, any third party outside of

11    the government's control, leads to a potential for

12    contamination because we're talking about not just what's

13    the shrapnel, but what's on it, what got lodged on it in the

14    blast, what chemicals are present.

15         And the petitioner here is not the only potential

16    defendant.  There would be -- and I can't say too much about

17    it, but as is stated in Special Agent Vanoosbree's

18    declaration, there were other people nearby the petitioner

19    when law enforcement reported seeing a canister rolled near

20    a vehicle right before the explosion occurred.

21         If other people were charged in a criminal case

22    and the petitioner here has had access to the evidence, has

23    been able to handle it, to manipulate it, then there's the

24    potential for contamination by a third party that the

25    government would not be able to address.

1          Those other individuals would in all likelihood

2     bring claims that the property was improperly handled, that

3     it was contaminated in some way and the government would

4     have to not only -- it's one thing for the government to

5     have to defend what its experts did, that's normal, that's

6     to be expected, but the government would be in a position of

7     having to defend the petitioner's expert's examination of it

8     and that is a harm to the government's case and a potential

9     harm to its investigation.

10          And when the Court looks at that harm, I think it

11     needs to compare it to the petitioner's need for that

12     property and what is the petitioner's need for that property

13     right now.  Before the Court should allow the petitioner to

14     have that access, causing that potential harm, she should

15     have to be at the point where she truly has irreparable harm

16     if she does not get it and I don't believe that she's there

17     yet.

18          THE COURT:  And what's the status of the

19     investigation such that we can say she's not there yet?

20          MR. BAUNE:  The status of the investigation is

21     that it's ongoing.

22          THE COURT:  And so we wait for the statute of

23     limitations for the United States to bring a prosecution and

24     that's what governs it or do we look to a statute of

25     limitations that governs the United States in a civil

1    action?

2            MR. BAUNE:  Right, I think there are multiple

3    statutes that the Court has to look at and it's a balancing

4    factor.  The government's statute of limitations for a

5    criminal case is one factor.

6            For the plaintiff I don't think it's so much just

7    the statute of limitations for bringing a civil case.  I

8    think you have to look at whether and when she reaches the

9    point of needing the evidence in a civil case.

10           Because if she files a civil case for defamation

11   and there's a motion to dismiss on the pleadings, again, the

12   shrapnel is not necessary for that because it's a

13   pleading-based motion.  If it's dismissed, then she has no

14   need for it at that time.

15           If it survives that, then she can come to the

16   court and say:  I've got a claim.  Here is what I'm

17   claiming.  I have a need for this in discovery.  I have a

18   need for it now.  And the Court at that point can be looking

19   at the actual case that is before it, not potential future

20   harm.  You would be looking at what's actually happening and

21   be in a much better position to rule on it.

22           I note that a dismissal, as the government has

23   requested of this case, would be without prejudice because

24   it would be for lack of jurisdiction.  So it would not

25   prevent the plaintiff from coming back later when her claim

1    is more fleshed out, when there's not a hypothetical harm,

2    and at that point she would be in a stronger position.

3           I can't say what the government's answer would be

4    because it's hypothetical.  But I think that's the most

5    appropriate response here given the debatable nature of the

6    plaintiff's current need for it.

7           Most of the cases in which -- this case is

8    unusual.  Most of the cases in which Rule 41(g) motions have

9    come up have been cases where, frankly, the government

10   should have filed a forfeiture action because it's holding

11   on to $65,000 in currency or a million dollars in checks in

12   one of the cases and the court is concerned about allowing a

13   *de facto* forfeiture.

14          But the plaintiff has focused on the *Black Hills*

15   case, which was the excavation of Sue, the Tyrannosaurus

16   Rex, and that's, I think, a highly distinguishable case for

17   several reasons.

18          First of all, there was significant evidence that

19   this rare and unique archaeological find was suffering

20   damage because it was stored in, I think, a machine shop at

21   the University of South Dakota.

22          Second, and this is, I think, an even more

23   important distinguishing factor, there was no dispute as to

24   what the fossils were.  There was no dispute that the

25   petitioners in that case were the ones who dug it up.  They

1      admitted to digging it up.  Everyone agreed that it was a

2      fossil.  The only point to introducing the evidence would

3      have been as a demonstrative type of exhibit to show what

4      the fossil was.

5              But there was no -- the question in that case was

6      basically whether it was taken from government land or not,

7      and the dinosaur itself was not a particularly important

8      part of that inquiry.  So it's very different than here

9      where you have a question as to what the shrapnel is, what

10     it's from and what's on it.

11             And the other factor, of course, in *Black Hills*

12     that clearly bothered the Eighth Circuit is that it was a

13     potential misdemeanor crime.  It was a $500 fine, I believe,

14     if they were caught.  Here we're looking at a potential

15     allegation that an improvised explosive device detonated,

16     causing injury.  That's a far more serious crime.

17             And the Eighth Circuit in *Black Hills* recognized

18     that in an ordinary case the equities would swallow the

19     petitioner's claim there.  That was a very extraordinary

20     case.

21             THE COURT:  I guess I want to push a little bit on

22     no damage or degradation to the property.  It seems to me as

23     time passes and the ability to conduct an investigation of

24     this property, there is a threat to the quality of the

25     evidence, the degradation of the evidence over the period of

1          time.  Why isn't that something I should be concerned about?

2                     MR. BAUNE:  Well, I mean, that's not fleshed out

3          at all in anything that the petitioner has -- it's the

4          petitioner's burden to show this and they haven't shown it.

5          Although they have produced an expert declaration, their

6          expert does not make any claims about that the property is

7          currently subject to degradation.  It's only vaguely stated

8          by counsel.  So absent that, there's no reason to -- they're

9          asking the Court to just assume that it will degrade.  First

10         of all --

11                    THE COURT:  But we're looking at DNA evidence, I

12         believe, or blood evidence, I believe, as well as, you know,

13         any other identification that might be gleaned from this

14         evidence.  It seems to me, no, it's not dinosaur bones, but

15         nevertheless it is something that has a capacity to have its

16         evidentiary value or quality degraded.  Is that not

17         something that I should be concerned about?

18                    MR. BAUNE:  I don't think there's been any showing

19         to that effect.  I understand why the Court would be

20         concerned about it.

21                    The limited *ex parte* declaration that the

22         government submitted focuses only on the testing that was

23         done, and there may be some answers to that question in

24         that.  The *ex parte* declaration does not generally talk

25         about anything that would be grand jury protected.  It talks

1     about a sensitive investigation.

2              And so there would be some discussion of the

3     testing that is done that doesn't talk about degradation

4     per se, but it would say what is being tested, whether or

5     not there is DNA or similar evidence that's being tested.

6              Obviously I would question -- without getting into

7     it too publicly, it was removed from the petitioner's arm,

8     so there's no question it is going to have her DNA on it and

9     I don't think that is particularly indicative of anything.

10    There's no question it was -- it came from her arm.

11             The bigger question is likely going to be what

12    types of residues from either an explosion or a chemical

13    could be found on it, and I don't think there's a reason to

14    believe that those are particularly sensitive to

15    degradation.

16             THE COURT:  And what's the nature of the

17    preservation of that evidence now?

18             MR. BAUNE:  My understanding is that it's -- I'm

19    not certain.  I know it's been recently moved back to

20    Brooklyn Center at the FBI.  My understanding it is probably

21    in a storage locker in the building, but I don't know that

22    for certain.

23             THE COURT:  Okay.

24             MR. BAUNE:  And I would briefly like to talk about

25    the ownership issue, which is -- obviously she owns the

1     clothing, there's no dispute as to that, but there is a

2     dispute as to who owns the shrapnel.  The petitioner's

3     argument is that by virtue of it being lodged in her she

4     acquired ownership interest.

5          The government has cited in its briefing a number

6     of cases in which bullets were removed from people who were

7     shot, which I think is the most analogous case, and in at

8     least three of those cases the court held not only did --

9     well, in all of the cases the court held that removal did

10    not violate the Fourth Amendment because, as in this case,

11    removal was always done by a hospital that the petitioner or

12    defendant in those cases went to of her own volition.  The

13    government didn't remove the shrapnel from her.  She went

14    there on her own.

15         And by going to the hospital in order to have them

16    remove the shrapnel, she is essentially abandoning or

17    consenting, I think is a better term, to the hospital

18    removing that shrapnel.

19         And the cases have held that when they give up --

20    when a person voluntarily goes to the hospital to have a

21    bullet removed, they give up their possessory right in that

22    bullet to the hospital.  The *Rodriguez v. Pierce* case cites

23    that, as does *Craft v. Commonwealth*.  Here --

24         THE COURT:  And so what would be necessary to

25    overcome that relinquishment?

1        MR. BAUNE:  Right.  And I think the courts refer

2   to it as a presumption.  I think that before the surgery

3   they would have to -- the person would have to go in and

4   make some sort of arrangement with the hospital.

5        THE COURT:  Really?

6        MR. BAUNE:  Well --

7        THE COURT:  Under these circumstances?  I mean,

8   let's make an argument that is helpful for looking at these

9   particular circumstances because I think that's the way to

10  fairly decide this case, or to look for analogies that can

11  be applied.

12       MR. BAUNE:  Right.  And it's difficult because I

13  have not found a single case where someone went to the

14  hospital to have something removed and the court held that

15  it was theirs.

16       It might be that she could eventually get it from

17  the hospital, but as of right now her claim to the property

18  is that she's the last possessor.  That is her claim that

19  she's asserted.  But she's not the last possessor because

20  the government didn't seize it from her.  The government

21  seized it from the hospital.  So I don't think the last

22  possessor analysis applies here.

23       It is a difficult question what would have to be

24  done in order to preserve it.  I think there would have to

25  be some agreement with the hospital.  I suppose if it wasn't

1    done before, perhaps it could be done later where the

2    hospital at some point abandons -- or agrees with the

3    petitioner.  To my knowledge, that never happened here.

4           THE COURT:  And for purposes of your analysis, you

5    would agree that the ownership issue only relates to the

6    Court's determination if we reach -- if I'm exercising my

7    equitable jurisdiction?

8           MR. BAUNE:  That's correct.

9           THE COURT:  Okay.

10          MR. BAUNE:  And as I've said, there's no issue on

11   the clothing.  That's obvious.

12          I'll just close, then.  In summary, it's the

13   government's position that the Court need not and should not

14   reach the actual merits of this because it has to address

15   jurisdiction first.  And I agree there's interrelation and

16   overlap between the two, but there's a four-part test that

17   is necessary for the Court to establish the anomalous

18   jurisdiction to hear this case in the pre-indictment mode

19   and the plaintiff has not met that standard.  In particular

20   she has not yet established that there is irreparable harm

21   and she also has not established that there was any

22   violation of her rights due to either the search or

23   retention of the property.

24          THE COURT:  Thank you, Counsel.

25          MR. BAKKE:  May it please the Court.  Randall

1    Bakke on behalf of Intervenor Morton County.  We appreciate

2    the Court allowing Morton County to intervene in this

3    matter.  This is a very important issue to Morton County.

4          And it's important to note we take no position in

5    relation to the jurisdiction issue.  We are not requesting

6    that the U.S.A. be asked to relinquish the evidence at this

7    point.  That's a matter between the U.S.A. and the

8    respondent and I think all the arguments have been made.

9          But 41(g) of the Rules of Criminal Procedure

10   addresses what can happen in the event the court does

11   exercise jurisdiction and one of the things that 41(g)

12   addresses is that the court may impose reasonable conditions

13   to protect access to the property and its use in later

14   proceedings.

15         And that is Morton County's concern, is access to

16   the evidence and use of it in the later proceedings, and

17   what we have requested of the Court, if the Court does

18   assume jurisdiction, is that all interested parties have

19   access to that evidence, that it be stored at some neutral

20   location, that there be protocols and safeguards put in

21   place so that all the interested parties in addition to

22   Ms. Wilansky can have access to the evidence, can conduct

23   testing, can develop a protocol among the experts for the

24   various parties so that we can avoid any of these potential

25   spoliation issues that could arise later.

1              They've agreed in part to that.  They say, well,

2     their expert would not -- Dr. Buc would not do anything to

3     degrade the evidence.  But, of course, we don't have any

4     information in regards to what Dr. Buc would supposedly do

5     or whether that would provide adequate safeguards.

6              And of course they argue, well, you can bring a

7     spoliation motion later in a civil proceeding, but, as I'm

8     sure this Court is aware, spoliation proceedings are not

9     often successful.  They're a last resort.  They're not a

10    preferred method of trying to gain access to the evidence or

11    deal with evidentiary issues.  The common practice is that

12    all the parties have access.

13             And here today I only represent one potential

14    interested party, which is Morton County.  Morton County is

15    the location where this event occurred.  Morton County had

16    law enforcement there through the sheriff's department.

17             But the Court may be aware this was a very large

18    protest involving thousands of protesters.  In fact, we had

19    officers in North Dakota from virtually all the sheriff's

20    departments throughout the state, many of the police

21    departments and law enforcement from outside the state of

22    North Dakota assisting with the protests.

23             And so at the time this event occurred, the law

24    enforcement officers that were there were not limited to

25    Morton County and so there are many other potential

1    defendants.

2            And, of course, we have no crystal ball as to who

3    the plaintiff might choose to name as a defendant in a civil

4    lawsuit, which would necessarily have to be initiated in

5    North Dakota, but those parties as well would have an

6    interest in this evidence and that's why it's so important

7    that if the Court does exercise jurisdiction, that there be

8    those type of reasonable conditions of access to the

9    evidence which would apply to all the interested parties

10   because, as indicated, we suspect there would be additional

11   parties included.

12           One of their arguments is that the evidence is not

13   germane to Morton County's defenses in this case.  In fact,

14   this shrapnel could be a very important element of defense

15   in this case because Morton County and other law enforcement

16   take the position that this explosive device, as they've

17   denominated it, did not come from law enforcement.

18           In fact, we believe the evidence will be that this

19   type of explosive device was not even part of the arsenal of

20   what law enforcement had available to it at the time of

21   these protests.  And so this will, in fact, be an important

22   piece of evidence, both the clothing of Ms. Wilansky and the

23   shrapnel.

24           And you have probably seen from the photograph

25   taken at the Hennepin County Medical Center that the remain

1    of the shrapnel, which is attached as Exhibit 1 to

2    Mr. Stoll's affidavit, is very small.

3              And so what happens if testing should occur?  If

4    that testing is destructive testing, will there remain

5    enough material so that others could engage in their own

6    testing?  I mean, there's a lot of issues that would have to

7    be sorted out in --

8              THE COURT:  I will admit that much of my

9    preparation has been focused on the shrapnel itself.  Would

10   you tell me a little bit more about the nature of the

11   clothing and, you know, what it is, how it would be useful

12   for this investigation.

13             MR. BAKKE:  Sure.  And of course when we got this

14   notice that this motion had been filed, that was our first

15   notice that they were potentially hiring experts or had

16   hired experts because, of course, there's no civil lawsuit

17   and so we're playing catch-up.

18             And without getting into communications we may

19   have had with experts, I can tell you that chemical analysis

20   of the clothing and chemical analysis of the shrapnel and

21   possibly metallurgical analysis of the shrapnel may shed

22   light on who the manufacturer of this device was, what the

23   metal constituents were, which could potentially rule in or

24   rule out certain devices.

25             And so all of that will be relevant information in

1     terms of having access to the evidence and having some sort

2     of testing done that is agreed upon jointly by the experts,

3     as often occurs, for all the interested parties.

4            In relation to who owns the evidence, to us it

5     seems like Ms. Wilansky is arguing out of both sides of her

6     mouth.  On the one hand she's saying it came from Morton

7     County or other law enforcement, but instead here when it

8     serves her purposes she's coming into this court and trying

9     to argue that she owns it and she possesses it and that she

10    was the original owner of this.

11           We expect in our lawsuit that she's going to claim

12    the opposite, that she's going to claim that the original

13    owner of this property was Morton County or some other law

14    enforcement entity.

15           So to us it seems there's an inconsistency there

16    in the argument they're making to the Court and we think

17    they will later change their position.

18           It is important for this Court --

19    THE COURT:  Help me understand why that ownership

20    analysis matters to you at this juncture.

21    MR. BAKKE:  Well, I don't know that it does other

22    than to point out the contradiction.  I think Mr. Baune hit

23    the nail on the head when he answered a very similar

24    question from the Court and indicated that Ms. Wilansky did

25    not possess it, it was Hennepin County.  And that evidence

1    came from Hennepin County in response to the government's

2    requests and was not taken from Ms. Wilansky.  I'm just

3    pointing out what I think will be a later contradiction in

4    the claims that we expect to be made in the civil lawsuit.

5           You know, I think it's important for this Court to

6    also be aware that there has been a very large amount of

7    pre-suit discovery done by Ms. Wilansky through her

8    attorneys.  There have been many what we call in North

9    Dakota open records requests that Mr. Stoll has sent and our

10   office on behalf of Morton County and other law enforcement

11   entities has assisted in responding to, very similar to a

12   FOIA request.

13          And so they have a great deal of information that

14   they have been able to obtain through these open records

15   requests.  There are some that we have objected to under our

16   applicable North Dakota open records statute, but many have

17   been responded to.  And so they have a significant advantage

18   over your typical plaintiff who is investigating and trying

19   to determine whether they should bring claims.

20          And that kind of leads me to the issue of this

21   defamation claim, which is very curious to me because it

22   seems to me that if Ms. Wilansky is going to pursue a

23   defamation claim against Morton County or some other law

24   enforcement, she has whatever evidence she needs in that

25   regard and that's her own testimony.  Often defamation

1    claims are initiated where a party says:  This wasn't me.

2    You falsely accused me.  I was there.  It didn't happen.

3         So she can start a defamation lawsuit if she wants

4    to at this time and she can go on in her complaint and say

5    upon information and belief, it's my belief that when I have

6    access to the evidence currently in the possession of the

7    U.S.A., that will further bolster my defamation claim.  I'm

8    not saying that would have any merit.  We believe that that

9    would not survive a motion for dismissal based on immunity.

10        And bear in mind here, you know, what's getting

11   overlooked I think in all of this is the fact that just

12   because she's saying the explosive device didn't come from

13   her and Morton County and law enforcement is saying it

14   didn't come from us, that doesn't rule out the possibility

15   it came from someplace else.  As I indicated, there were

16   many, many protesters present at the time.  It very well

17   could be that this explosive device came from another

18   protester that's not Ms. Wilansky.

19        And I note that in none of the exhibits or

20   evidence presented to this Court have they given you any

21   information to suggest there was some type of affirmative

22   statement by Morton County blaming Ms. Wilansky.  They

23   haven't provided a newspaper article.  They haven't provided

24   a quote.  They haven't provided news media coverage.

25   Nothing.  They're just saying, well, we think they're going

1       to blame Ms. Wilansky if a defamation lawsuit is started.

2              And so I think this defamation issue is kind of a

3       pretext to try to gain access to the evidence, but certainly

4       there's nothing holding them back from starting a defamation

5       lawsuit.  I think it would be dismissed early based on

6       immunity, but there's certainly other possible sources in

7       regards to whatever it was that injured her.

8              And in regards to the irreparable harm issue, one

9       of the things that she argues is that, well, I have a lot of

10      medical bills.  Well, that's not irreparable harm.  I mean,

11      in many personal injury cases the party has a lot of medical

12      bills.  And we ask ourselves the question:  If that's the

13      basis for her irreparable harm argument, why hasn't she

14      started the lawsuit already?

15             And in terms of irreparable harm, if the device

16      came from another protester, which it very well could have,

17      that counters her irreparable harm argument.

18             And Morton County has an absolute right, as do

19      other law enforcement, to assert in response to a claim made

20      by Ms. Wilansky's father that this device came from law

21      enforcement to say, no, it didn't.  That's not defamation,

22      to simply defend yourself and say it didn't come from us,

23      it's not part of our arsenal.

24             And so I think the defamation claim, you know --

25      and even Mr. Stoll conceded that he believes there's

1    accusations, quote, potentially including Sophia herself,

2    end quote.  So that seems to me to be an acknowledgement

3    that there isn't a viable defamation claim there.

4              In regards to the lawsuit and the Court asked

5    about the statute of limitations --

6              THE COURT:  Why is that evidence that there isn't

7    a viable lawsuit?

8              MR. BAKKE:  If there was testimony that it

9    potentially included her, because that's simply Morton

10   County defending itself, and I don't think they ever said

11   that, but saying "potentially" doesn't rise to the level of

12   the defamation requirements under North Dakota law.  There's

13   certain elements that you have to establish, and potentially

14   being defamed doesn't qualify.  It won't meet our elements.

15             THE COURT:  Thank you.  I wanted to make sure I

16   was tracking your argument.

17             MR. BAKKE:  Sure.  Okay.  I should have made that

18   more clear.

19             In regards to the statute of limitations issue,

20   I'm involved in many cases currently and many cases in the

21   past defending law enforcement.  I can tell you that

22   plaintiff's lawyers routinely take the position in North

23   Dakota that the statute of limitations on Section 1983

24   claims is a six-year statute of limitation in federal court.

25   And so I think the statute of limitations argument really is

1     not a basis here for Ms. Wilansky to get early access to

2     this evidence.

3          And let me give you an example.  I would

4     suspect -- let's say we play this out and there is some

5     testing done and we're involved in the testing and others

6     are involved in the testing and Ms. Wilansky's experts are

7     involved in the testing.  As this Court is aware, there are

8     often disagreements between experts on what the evidence

9     means.  I would suspect this case may be no different, that

10    you may have a divergence of opinions.

11         I don't think that there's going to be definitive

12    evidence, that Ms. Wilansky is going to get every party to

13    concede, in regards to what this shrapnel means or what the

14    test results mean.  So under her theory she could never

15    start a lawsuit until there was unanimity in regards to what

16    the test results meant or showed.  As this Court is aware,

17    in a civil situation that rarely occurs.  There's often

18    differing opinions as to what the evidence means.

19         And so even as an example, there might be an

20    allegation -- and I'm just, you know, giving the Court a

21    hypothetical.  She could say, even if the test results by

22    her own expert showed that it was an explosive device, she

23    could argue, well, I think there was another explosive

24    device that caused a propane tank to explode and that's what

25    ended up in my body, which was precipitated by the explosive

1    device.  I mean, there could be many different theories that

2    aren't tied to definity in terms of what this metal shrapnel

3    or the residue on her clothing is.

4            And once again, as I said before, she can make

5    allegations based upon information and belief.  She could

6    initiate the lawsuit and ask the Court to hold discovery in

7    abeyance, could ask the Court to conduct discovery early in

8    regards to the shrapnel and the clothing.  I mean, there's

9    many things that could be done.

10           The Court asked the question can she identify the

11   proper defendants in a civil lawsuit, and she has the

12   information she needs in that regard because bear in mind

13   here law enforcement takes the position this device did not

14   come from us, period, and so doing some testing would not

15   shed any light on the individual or law enforcement entity

16   that supposedly launched this because our investigation

17   reveals it didn't come from law enforcement.  So no amount

18   of discovery is going to change that.  Whatever information

19   she believes she has to start a lawsuit against law

20   enforcement --

21           THE COURT:  So she has to take your word for it?

22           MR. BAKKE:  No.  She can conduct discovery on

23   that, but I don't think there's going to be any evidence to

24   suggest this was even part of our arsenal or that it came

25   from any law enforcement entity.  Sure, I suppose that could

1    change.  Maybe there's something we're not aware of at this

2    point.  Maybe somebody changes their testimony.  Anything

3    like that is always possible.

4         My only point is she has what she needs now based

5    on these public records requests to know who was there, who

6    the different law enforcement entities were, and if she

7    deems it appropriate to initiate suit.

8         The Court is also aware, I'm sure, that what

9    routinely happens in these civil lawsuits if there's an

10    individual defendant who is unknown, it's very common to

11    name John Does A through Z or 1 through 20 or however they

12    want to do it.  We see that with some frequency in

13    Section 1983 claims because they can't always know on the

14    front end who those individuals might be.  I'm merely

15    pointing out that to say, well, she can't start it because

16    she can't identify all the individuals she thinks are the

17    proper defendants, those types of lawsuits get initiated all

18    the time.

19         THE COURT:  And if that lawsuit were initiated,

20    you would not be contesting access to evidence pertaining to

21    further identification of actions that your own client would

22    be allegedly liable for?

23         MR. BAKKE:  Well, I think subject to a protective

24    order, and we're kind of getting a bit into another area,

25    but I can --

1           THE COURT:  Well, you've taken me straight there,

2      I think --

3           MR. BAKKE:  Sure, sure.

4           THE COURT:  -- based on your arguments.  I was not

5      expecting to go there, but now that you've raised the

6      issues, I think it needs to be clearly and carefully defined

7      if you're presenting it to me for some consideration.

8           MR. BAKKE:  Sure, and I absolutely will.

9           There is another case that arises as a result of

10     the protests called the *Dundon v. Morton County, et al.*

11     case.  That case has been to the Eighth Circuit Court of

12     Appeals based on Judge Hovland's decision denying the motion

13     for preliminary injunction by the plaintiffs.  It's about

14     nine plaintiffs who claimed personal injuries during the

15     protests and a purported class action.  The case is now back

16     before Judge Hovland.

17          In that case, because of death threats to law

18     enforcement, certain records have been sealed and there is a

19     protective order in place in that case, but there's been

20     some very legitimate concerns in regards to substantiated

21     death threats against officers and their family members.

22          So the reason I'm hesitating to answer the Court's

23     question about would these individual officers be

24     identified, subject to restrictions that we believe would be

25     necessary and are already in place in a companion case, I

1      think that information would be released and dealt with in a

2      similar fashion to the way it has been in the *Dundon* case.

3              I hope that answers the Court's question.

4              THE COURT:  That's helpful.  Thank you.

5              MR. BAKKE:  You know, they say we can subpoena the

6      shrapnel from the petitioner, but we can't subpoena the

7      shrapnel from the petitioner because there is no lawsuit.  I

8      mean, we have no ability in a civil action until they start

9      one to do that.  And once again, that doesn't afford us the

10     access and safekeeping we need to have assured in the

11     meantime.

12             So really what we're asking this Court to do, if

13     it does exercise jurisdiction, is have this evidence, the

14     clothing and the shrapnel, placed in the possession of an

15     agreed-upon neutral third party laboratory in the

16     Minneapolis/St. Paul area, that there be an access protocol

17     set up agreeable to all the parties and confirmed by the

18     Court which would allow all interested parties access to the

19     evidence for purposes of photographing, visualizing,

20     testing, subject to agreement by all the parties to make

21     sure those types of safeguards are in place in regards to

22     access and use of the evidence in any potential civil

23     proceedings.

24             Thank you.

25             MR. STOLL:  Thank you, Your Honor.  I want to

1     start by addressing what appears to be the main argument by

2     both the federal government and Morton County, which is that

3     Sophia Wilansky could file a civil suit against somebody

4     without the shrapnel.  And that is true, but it is not at

5     all the question that's at issue in this case.  That is not

6     the test that Sophia has to meet and that is not the

7     standard to be applied here.

8             The test on the merits in this case is whether the

9     government has held the property for an unreasonable amount

10    of time and whether the petitioner has shown a right to that

11    property.  She doesn't need to show that she needs the

12    property to file a suit or that she needs it for some other

13    particular reason to meet the fact that she has a right to

14    that property.

15            On the issue of irreparable harm, which I think

16    the lawsuit issue does speak to, it's worth reiterating what

17    a low bar there is for irreparable harm in the Rule 41(g)

18    context.  Oftentimes it's getting conflated here with the

19    preliminary injunction standard, which is a different

20    standard.

21            If I can just quote the Seventh Circuit from

22    *Mr. Lucky* here just to explain what the bar looks like on

23    the standard.  The court said, (As read) "Whenever the

24    government seizes property, in this case money, and

25    withholds it for an unreasonable length of time without

1    bringing charges and without offering evidence to justify

2    its continued withholding and without any indication as to

3    when, if ever, charges will be filed, the plaintiff suffers

4    irreparable harm."  That's it.

5            That is clearly the case here.  The government has

6    held the property for an unreasonable length of time.  It

7    has not brought charges.  It has not offered Sophia any

8    evidence of how long it's going to hold the property or when

9    it's going to issue charges.  And so Sophia suffers an

10   irreparable harm there.

11           You know, Mr. Lucky is not an outlier in this

12   respect.  Morton County noted that her medical bills aren't

13   irreparable harm, but I think they absolutely do satisfy the

14   standard.  In several cases the courts have held that just

15   being deprived of cash is sufficient irreparable harm.  So

16   Mr. Lucky is one of those situations.  His only need for the

17   cash was to pay his taxes.  Here she just needs the property

18   to pursue a remedy for her medical bills.

19           THE COURT:  And what constitutes an unreasonable

20   length of time?

21           MR. STOLL:  Well, I think that --

22           THE COURT:  I mean, what am I measuring against?

23   Am I looking to a statute of limitations?  Am I looking to

24   some evidence of degradation of evidence?

25           MR. STOLL:  The courts are not super clear in this

1   respect, Your Honor.  I do not think you are looking to the

2   statute of limitations.  No court that I have seen has used

3   that as the metric for the length of time.

4        I think what the courts are trying to do is that

5   they look at the nature of the case and they say could the

6   government have either completed its investigation if it was

7   being diligent and brought some charges or could the

8   government have completed its need for the evidence in terms

9   of testing it and then be operating off of alternatives or

10  substitutes.  That's why you're seeing -- you know,

11  consistently at 17, 18 months or less courts are saying you

12  have to give the property back.

13       The courts are not super clear about sort of the

14  metric that they're using to say 17 or 18 months is enough,

15  but I think the substance of their decisions suggests that

16  at that point the government, if it was acting diligently,

17  could have brought charges or should be relying on

18  substitutes because of how long the private citizen has been

19  deprived of their property.

20            THE COURT:  And here we're talking about the

21  deprivation of a potential piece of evidence that was a part

22  of your client's body?

23            MR. STOLL:  Yes.

24            THE COURT:  The shrapnel?

25            MR. STOLL:  Absolutely.  And I can speak to the

1    ownership interest there.  You know, the federal government

2    noted that, you know, our argument is that she's the last

3    possessor and that's not true because Morton County Medical

4    Center had it afterward.  But that actually flips the

5    argument on her head, right?

6         Her ownership interest comes from her being the

7    first known possessor of the property, and the law on that

8    is that subsequent possessors don't trump a prior

9    possessor's property interest.  So the fact that she's the

10   first known person to have found this property, found it by

11   having it lodged in her body, is what gives her an

12   entitlement to it.

13        THE COURT:  Why don't we look to where it came

14   from as that's what --

15        MR. STOLL:  Morton County has suggested that

16   there's an inconsistency here, but in a world in which

17   Morton County is claiming that it absolutely disclaims any

18   sort of possessory interest in the property and says it

19   didn't come from its munition, I would say that if we are

20   eventually able to show that it did come from Morton County,

21   they abandoned it and at that point Sophia then found it

22   when it got lodged in her body and she becomes the owner of

23   it.

24        If Morton County or whoever, you know, had the

25   munition that eventually got lodged in her body comes

1     forward with evidence that it had title to that item before

2     Sophia did and that it didn't abandon it, then Sophia would

3     have to give the property over to that party.  But no party

4     is willing to come forward and at that point it's found

5     property.

6          The federal government -- in fact, both

7     governments cite to these sort of bullets cases where

8     they're removed at hospitals, and I think the key point

9     about those cases are that the underlying possessory

10    interest of the victim in those cases isn't really at issue

11    in those cases.  The question there -- they were all

12    suppression of evidence cases and they were all decided on

13    the fact that either there wasn't a government actor because

14    the surgeon who removed it wasn't a government actor or the

15    victim lacked a privacy interest and so there wasn't a

16    search.  But victims can lack a privacy interest in

17    something that is nonetheless their property all the time.

18         So the courts didn't need to decide the possessory

19    interest question to decide those cases.  It wasn't really

20    queued up for the court in those cases.  So to the extent

21    that they commented on it, I think it's clearly dicta.  None

22    of the cases cited by the governments on this are

23    controlling to you or to this court.

24         You know, I would suggest that those cases may be

25    wrongly decided and that there's some -- the Court should be

1    concerned about issuing a ruling that says that somebody who

2    is brought into a hospital while unconscious and a surgery

3    was performed on them somehow forfeited all their possessory

4    rights to whatever was removed from their body and

5    therefore, you know, the government is free to take that

6    from them.

7             I think in a case in which -- you know, you could

8    imagine how blood removed from somebody during a surgery,

9    the government could swoop in and grab that blood.  That's

10   extraordinary private property to the person from whom it

11   was removed.  I'm not --

12            THE COURT:  Yes, but the government is always

13   doing tests on fingerprints or blood left at a scene and it

14   seems to me -- I don't see that that is particularly

15   invasive as you are trying to address it.

16            And the fact that someone was in a place and left,

17   lawfully or not, left blood behind when they were harmed, it

18   seems to me that doesn't give them the right to tell the

19   owner of that place that they can't give access to someone

20   else to determine whether it's the blood of the person who

21   is bringing the lawsuit or claiming the harm that has

22   occurred.  This seems really attenuated.

23            MR. STOLL:  Again, Your Honor, I would say that

24   there's -- I would distinguish between the question of

25   whether the government had a right to take the shrapnel or

1    the blood or the bullets in the first place and whether the

2    shrapnel or bullets or the blood is at its base owned by the

3    victim.  Those are two different questions.

4         And the government -- you are absolutely right,

5    the government is allowed to take a citizen's private

6    property subject to warrants, subject to probable cause,

7    subject to subpoenas all the time.

8         THE COURT:  Is this different from fingerprints?

9         MR. STOLL:  Well, in a fingerprint case there's no

10   item that sort of results from the government's test that

11   could be given back to the person.  Right?  They still have

12   their fingers and their fingerprints.  The government --

13        THE COURT:  So your client wants her blood?

14        MR. STOLL:  My client wants the shrapnel back --

15        THE COURT:  Okay.

16        MR. STOLL:  -- because it's her property.  She

17   found it.  Nobody is claiming prior possession of it and the

18   law says that that makes it hers.

19        And I think the only case that I've seen on the

20   question of possessory interest in the context of a

21   Rule 41(g) case is this *Government of Virginia Islands v.*

22   *Edwards* case and that was a case in which the government

23   confiscated jewelry from somebody who was a known burglar

24   and who eventually got convicted of stealing jewelry.

25        But the government was not able to show that the

1    particular jewelry it seized was actually owned by somebody

2    else and so the court required the government to return that

3    jewelry, even though it was probably stolen property, to the

4    person who they took it from, to the criminal defendant.

5    And I think that just goes to establish that, you know, the

6    possessory interest -- the person who actually was in the

7    possession of the item is the critical piece here.

8            So that's sort of the ownership interest piece,

9    but I think it's important to remember that the ownership

10   interest, the irreparable harm, inadequate remedy, these are

11   all factors that the Court is balancing just to determine

12   jurisdiction.

13           And Sophia doesn't need to meet or establish by

14   some, like, high burden every one of these factors.  They're

15   all balanced together just to determine whether this is the

16   type of case the Court should hear.

17           And courts do hear cases where the petitioners

18   don't establish callous disregard or don't establish

19   irreparable harm.  *Ramsden* is an example of a case from the

20   Ninth Circuit where the court held explicitly that there was

21   no irreparable harm, but still took jurisdiction over the

22   case and still ordered the return I believe in that case it

23   was business documents.

24           I think it's important to address the *Fyler* case

25   that the federal government brought up because they claim

1      that that is on point here and I think it's worth delving

2      into the facts of that case because, number one --

3                  THE COURT:  Before we go there, so fingerprints,

4      would we be in the same position here if we were talking

5      about fingerprints left behind?

6                  MR. STOLL:  I don't think so, Your Honor, because

7      I don't think that the -- the fingerprints are left at a

8      scene.  First of all, I think they are probably abandoned to

9      the extent that they're objects.  So if you were at a crime

10     scene and you touched something and then you walked away,

11     you're not -- you're evincing a pretty clear intent not to

12     come back and get the residues from your fingers back.  So

13     there's no possessory interest there.

14                 But also it's not really a tangible object that

15     could be returned.  I mean, once the government dusts for

16     the prints and does its analysis, I mean, my understanding

17     is that the government has sort of a lab result, but then

18     there's nothing else there to return.

19                 THE COURT:  So make sure I am focusing on the item

20     that you're talking about being able to be returned or not

21     being able to be returned.

22                 MR. STOLL:  Correct.  The item at issue is the

23     shrapnel --

24                 THE COURT:  Right.

25                 MR. STOLL:  -- the actual 1 millimeter by

1    millimeter piece of metal and whatever else is stuck on

2    there at this stage.  That's what we are interested in

3    having returned because that item --

4              THE COURT:  Why isn't whatever is stuck on there

5    the equivalent to the fingerprints as opposed to the

6    shrapnel itself?

7              MR. STOLL:  Well, it's hard to say at this point,

8    Your Honor, because I don't know what is, in fact, stuck on

9    there.  The government hasn't disclosed that to us.  So I'm

10   arguing a little bit at a disadvantage here.

11             But let's imagine there's tissue on there.  That

12   tissue is probably Sophia's tissue, so that would be her

13   property in the same way that, you know, a bone fragment

14   that was removed from her arm would be her property or, you

15   know, muscle tissue that was removed from her would be her

16   property.  You know, that's biological matter that belongs

17   to her.

18             If there's residues on there, I mean, we would

19   have to look at the residues to see whether the residues are

20   also her property or not.  She was certainly in possession

21   of those residues at the time that they were removed from

22   her body and given to the government, and nobody has claimed

23   a prior possessory interest in those residues.  So I would

24   think that the residues, even though they are, you know,

25   barely tangible, are her property as well.

1          I am having trouble with the fingerprint analogy

2    just because -- I mean, I guess I'm failing to see what the

3    tangible property that results from the fingerprint is.  I

4    mean, I guess it's like the oils from the finger that are on

5    the object.  My guess would be that in most cases the

6    dusting for fingerprints process destroys that, so there's

7    nothing to return to the individual.

8          So I think the combination of the abandonment of

9    your fingerprint residues as a general matter and the fact

10   that they're usually probably destroyed in the dusting

11   process or somehow altered and not preserved, there's

12   nothing to return in a fingerprinting case; whereas, in this

13   case the residues -- if there is still residue on that

14   shrapnel, there is something there to be returned to the

15   petitioner.

16          THE COURT:  Residue of what kind?

17          MR. STOLL:  I think that regardless of what it

18   ends up being on -- what that residue ends up being, that

19   residue was in Sophia's possession when she arrived at the

20   hospital and she never evinced an intent to abandon the

21   residues or the shrapnel and as soon as she had an

22   opportunity she started, via her father, her agent, calling

23   government agencies and saying, hey, I'm just making a point

24   of pointing out I think this is my property, I'm not

25   abandoning it, I want it back.

1          The government's sort of contention that Sophia

2     had to somehow make a deal with the hospital before the

3     surgery saying that she wanted the shrapnel back I think

4     borders on the absurd.

5          I mean, between the point at which Sophia was

6     injured and the point at which the shrapnel was extracted

7     from her body, I don't think she was -- I think she was

8     essentially unconscious the entire time.  So it would be

9     basically an impossible standard to meet, to say that she

10    had to somehow make a deal with the hospital beforehand.

11         Can I turn to the *Fyler* case?

12         THE COURT:  Yes.

13         MR. STOLL:  Okay.  So the federal government cites

14    this as a case where there was no irreparable harm, and I

15    think it's important to note what exactly the details of

16    that case were because that was a case in which the harm

17    being claimed was that the petitioner was worried that the

18    government was going to file an indictment against it and

19    that that would be an improper indictment and that would

20    harm its reputation.

21         And it is true that the court said that that is

22    not an irreparable harm, but that is not the situation here.

23    This is a situation in which government agents and the media

24    have made overt public accusations against my client.  So

25    this isn't some fear of a future indictment.  This is an

1    already manifested accusation against my client that harms

2    her reputation.

3              And, in fact, if the *Fyler* case is analogous to

4    anything, it's analogous to Morton County's position here

5    because Morton County is in the position of saying its only

6    interest here is in the fact that it worries that it will

7    someday be a defendant in a case where the shrapnel becomes

8    evidence.  And in that case I agree with the *Fyler* decision

9    that that is not a sufficient interest and it's not

10   sufficient irreparable harm to have standing to have any

11   right to the property.

12             The other thing I would note about the *Fyler* case

13   is that the court also found that there was no callous

14   disregard of the petitioner's rights.  There were other

15   bases upon which the court decided not to exercise

16   jurisdiction and one of the sort of main factors that the

17   court considered was the fact that the government gave the

18   petitioner access to the documents that he wanted to see.

19             So business documents were seized.  The petitioner

20   wanted them back.  The government said we're not going to

21   give them back, but you can come and you can copy them, you

22   can read them, you can access them.  So the court said in

23   that respect you have everything you need because you have

24   the documents.

25             But in this case, you know, Sophia has asked for

1    the analogous relief, which is you keep the shrapnel, allow

2    our expert to come and analyze it in your presence and make

3    sure that we have a full understanding of what the shrapnel

4    is.  And the government has said no to that.  So the

5    government is, you know, not taking the same position in

6    this case that it did in the *Fyler* case.

7          On the issue of the potential for contamination

8    and degradation, which seems to be the federal government's

9    other main concern, really the only concern that they've

10   articulated about what harm they'll suffer if the shrapnel

11   is returned, what I would say to that is, one, the

12   government has already completed its testing.  So for

13   purposes of the government's evidence, the government has

14   what it needs.  It has the lab results.

15         Number two, this particular issue is directly

16   addressed head on in the getaway car example in the Eighth

17   Circuit case.  The Eighth Circuit case explained there that,

18   tough, if the government holds the property for too long,

19   they have to make do with the alternatives, such as the lab

20   results and the fingerprint evidence and the pictures.  You

21   have to return the object.

22         And the last thing is, you know, again, we've

23   offered the government on numerous occasions the compromise

24   of them keeping possession of it while Sophia's expert is

25   granted access to analyze it.  Sophia's father offered that

1    deal to Agent -- to Mr. Delorme, who rejected it.  We have

2    offered that compromise in every one of our pleadings in

3    this case.  The government has never explained why that

4    compromise would be prejudicial to any of the government's

5    investigations or interests.

6          And with respect to the issue of other potential

7    criminal defendants wanting access to this property, the

8    government would still have the property and would have

9    always maintained chain of custody of that property and

10   could give access to that property to the other defendants.

11   So I don't see how the contamination issue really helps the

12   government here, especially with respect to our compromise

13   position.

14         You raised the question of whether, you know, the

15   shrapnel may be sort of degrading while it's in the

16   possession of the government.  And the government's argument

17   is, well, Sophia hasn't made that showing.  I would submit

18   to you, Your Honor, that --

19         THE COURT:  What showing?

20         MR. STOLL:  That Sophia has not met its sort of

21   burden of persuasion that the shrapnel is currently

22   degrading while it's in the federal government's possession.

23   And I would suggest that we are not required to make that

24   showing.

25         THE COURT:  Why not?

1          MR. STOLL:  The government hasn't given us any

2     information about how it's storing the shrapnel or what's --

3          THE COURT:  But don't you have the burden of

4     establishing degradation?

5          MR. STOLL:  I don't think so.  I think at this

6     point we are required to make a good-faith suggestion that

7     it's a possibility.  And we have made that suggestion.

8     Things dissipate over time.  The government is running

9     testing on it.  They have not supplied us with any

10    information about what kind of testing they are doing or how

11    that is affecting the shrapnel.  And, you know, property --

12    or biological material and residues erode over time.

13    Without some information from the government about what

14    these materials are and how they're being stored, I don't

15    see how Sophia could possibly be in a position to sort of

16    make a showing of that.

17         The last thing I would say is just with respect to

18    Morton County's position on this, you know, Morton County

19    says that all they're asking for here is that all the

20    interested parties in this action have access to the

21    shrapnel.  And my position is Morton County is not an

22    interested party here.  They affirmatively disclaim any

23    possessory interest in the shrapnel.

24         The only interest that they assert in this whole

25    case is that they are worried that they might be subjected

1    to a lawsuit and that they want to be able to defend

2    themselves.  And that's fine, but they have cited no legal

3    authority and I am aware of no legal authority that suggests

4    the government is allowed to deprive a private citizen of

5    that citizen's property simply because the government thinks

6    that the private citizen may sue the government.  And if the

7    government were allowed to do that, I would have serious

8    concerns over, you know, the government taking away property

9    that citizens need to --

10              THE COURT:  Is it depriving of property or

11   preservation of important property to both or all three

12   parties?

13              MR. STOLL:  Well, it's depriving Sophia of her

14   possession of the property.  Morton County has asked that it

15   be held not in Sophia's possession, so it is clearly taking

16   away her property.  I agree that she's being granted access

17   to it, again, a compromise with the federal government that

18   we have, in fact, offered.

19              But I would say in civil litigation would-be

20   defendants don't get to, prior to the filing of any

21   litigation, just go take or demand access to a private

22   citizen's property.

23              The appropriate remedy in a situation like this is

24   a spoliation sanction and, you know, Morton County says

25   that's a less than ideal remedy for it and I think that

1   that's probably true, but it is a much more suitable remedy

2   than taking away a private citizen's property or depriving

3   her of possession of it prior to any litigation against

4   Morton County.

5          Just to clarify a couple of things.

6          THE COURT:  And help me.  Where would the -- when

7   you say depriving of possession, is there any commitment to

8   maintaining the property in any particular way?

9          MR. STOLL:  Yes.  So Sophia's expert, Dr. Buc, has

10  a lot of experience maintaining precious artifacts,

11  including ones that are going to be used by law enforcement

12  as evidence.  She is a forensic chemist and works quite

13  closely with law enforcement.  So she will preserve the

14  evidence so it does not continue to degrade and she will,

15  you know, make -- we already agree that under appropriate

16  authority, if it was subpoenaed by a third party or the

17  government asked for it for use in a trial, we would comply.

18         So we're not looking to destroy the property or

19  abscond with it.  We are simply looking to have possession

20  of it so that we can test it sort of on our own timetable.

21  And if we need to sort of run a test, go back and analyze

22  the results, test it again, we have the ability to do that.

23  My only concern --

24         THE COURT:  Does testing degrade the property?

25         MR. STOLL:  What was that?

1           THE COURT:  Does testing degrade the property?

2           MR. STOLL:  The testing that our expert has

3     proposed will not degrade the property because it's largely

4     just taking photographs of it under extreme magnification,

5     measuring it.  Another thing that our expert would like to

6     do is put a magnet up to it to determine whether it's

7     magnetic or not.  But none of those things would actually

8     change the chemical composition of the property or degrade

9     it.

10          I think, depending on what we find with the

11    shrapnel, there could be an issue down the road in which,

12    you know, one of the parties here wanted to do destructive

13    testing, but I think that would be a whole different thing

14    and we could try to reach an agreement about it or we could

15    end up back before Your Honor on that question.

16          Just to clarify a couple of things from Morton

17    County, Your Honor.

18          We have filed numerous open records and FOIA

19    requests, but they have almost entirely been denied.  So the

20    idea that we have all this information from free discovery

21    is not true.

22          So just to give you an example, we did file FOIA

23    requests asking what munitions were law enforcement carrying

24    on the night Sophia was injured.  They refused to supply

25    that information.  We asked who were the officers who were

1    present on the night that Sophia was injured.  They refused

2    to supply that information.  Both the FBI has refused to

3    supply that information and Morton County has refused to

4    supply that information.  So we have tried to gather the

5    evidence in reasonable ways and we have largely been denied

6    that evidence at every step of the way by the governments.

7            And in terms of the defamation claim, Morton

8    County suggested that we have not actually asserted that

9    anybody has made defamatory statements about Sophia, but,

10   you know, that also is not true.

11           Lieutenant Iverson from Morton County has made

12   statements to the news media about protesters that were

13   involved with Sophia making these propane tank bombs and he

14   issued pictures of charred propane tanks to the media, which

15   then obviously published stories about how the protesters

16   were making, you know, improvised explosive devices.

17           In addition to that, Sheriff Paul Laney --

18           THE COURT:  And so is that tied to or tethered to

19   Ms. Wilansky, she's identified, or you're saying --

20           MR. STOLL:  Yes.

21           THE COURT:  -- she was a protester and they're

22   saying protesters did X?

23           MR. STOLL:  I would have to go back and look at

24   the exact statements before I would want to precisely

25   characterize them, but what I can say is that Lieutenant

1    Iverson made it clear that Sophia's injury was caused by a

2    group of protesters near her in conjunction with her trying

3    to make IEDs and he certainly suggested that in such a way

4    that the news media then ran stories saying that Sophia was

5    party to the creation of explosive devices for use against

6    law enforcement.

7              THE COURT:  But isn't that a claim against the

8    news media?

9              MR. STOLL:  Well, I would say when Iverson sort of

10   gave statements to the press about it publicly, that would

11   defame Sophia.  Again, I would need to see the exact

12   statements before I want to characterize them, but the other

13   thing --

14             THE COURT:  Well, but you can't be making these

15   arguments without any foundation in fact.  It seems to me if

16   you aren't able to say with certainty in answering my

17   question -- and I'm not saying you should know the record so

18   completely -- you can say I don't know, but I don't want

19   this supposition that slips into characterizations that are

20   not true as to what statements, which are verifiable, can be

21   attributable to particular individuals.

22             So it's fine for -- this is a complex set of

23   circumstances.  There were lots of moving parts both at the

24   time and subsequent to and there's going to be -- there's

25   nothing wrong with saying I don't know and I don't recall

1    that.  There is something wrong with making an assertion

2    that's not tethered to facts and make it as if it is.

3             MR. STOLL:  Your Honor, that is why we've been

4    very careful not to make any characterizations publicly or

5    even in the briefing about who said what.

6             THE COURT:  And in response to my questions too,

7    that's very important.

8             MR. STOLL:  That's fair enough, Your Honor, and

9    that's why I am being very clear that with respect to

10   Lieutenant Iverson, I am not prepared at this stage to say

11   that he specifically fingered Sophia as making any IEDs.

12            THE COURT:  Okay.

13            MR. STOLL:  But he did say that protesters were

14   making them in relation to Sophia's injury and Sheriff Paul

15   Laney has said that Sophia was involved in the making of

16   IEDs.  He is the sheriff, I believe, of one of the counties

17   adjacent to Morton County that was participating in these

18   raids -- sorry, in the sort of protest issues.

19            But in addition, it's not -- her irreparable harm

20   comes from the injury to her reputation.  It's not important

21   whether the government caused that injury to her reputation.

22   Even if her defamation suit would be against the media or

23   against some particular editorialist for asserting that she

24   was making bombs, that's still irreparable harm to her and

25   that still satisfies the elements here for you to take

1      jurisdiction in this case.  I don't believe that Sophia has

2      to show that her irreparable harm is caused by the

3      government in order to establish that prong.

4              And with that, I will rest.

5          (The Court and court reporter confer)

6              THE COURT:  Counsel, you may respond briefly.

7              MR. BAUNE:  Thank you, Judge, and I do intend to

8      be brief.

9              But I would start by saying it's the

10     plaintiff's -- or the petitioner's obligation, her burden,

11     to meet the elements of equitable jurisdiction and one of

12     those is equitable harm.

13             All this discussion we're having about defamation

14     today, I don't believe the word "defamation" appears in the

15     petition or in any of the briefing.  It's not set forth, as

16     far as I can tell, anywhere.

17             And there's no clear discussion anywhere of what

18     her harm would be, what case she needs to bring in two

19     years, why she needs to bring something in two years.  I

20     think she had to plead that at some point prior to today,

21     and even today I think she's got problems with it to the

22     extent she tries to address it.

23             With respect to the issue of reputational damages,

24     I think the *4801 Fyler* case is quite clear and I think it

25     covers this.  Another case that also addresses it in even

1   greater detail, which is cited in our reply memorandum, is

2   the *United States v. Search of Law Office, Residence, and*

3   *Storage Unit of Alan Brown*.  That's 341 F.3d 404.  That

4   involved a search and seizure of records from a law office

5   and there was a reputational harm analysis there which was

6   declined by the court along similar lines, but expanded to

7   those that the Eighth Circuit said in *4801 Fyler*.

8         Also, I don't believe that medical bills are pled,

9   as far as I can tell, in any detail.  I think this is just

10   brought up today and I think, again, that's too late if

11   that's the basis for jurisdiction.

12         As far as the ownership issue, I will say that at

13   one point I did argue that she would need to address

14   ownership with the hospital before it was removed, but I

15   believe that upon -- in response to prodding from the Court,

16   I amended that to at some point she would have to work that

17   out with the hospital, not necessarily before the surgery.

18         And lastly I want to address just a couple of

19   cases that were cited by the petitioner.  The first is the

20   case out of the Virgin Islands in which property went back

21   to the last possessor.  That was the jewelry.  I would point

22   out that in that case it was a post-trial Rule 41(g) motion,

23   so it was not invoking equitable jurisdiction.  It was a

24   year after sentencing and this property was being held and

25   there was no particular investigation.  The government just

1   wanted to keep it forever without forfeiting the property.

2   As someone who has done a fair bit of forfeiture, I can tell

3   you that's not allowed and it's no surprise that that was

4   rejected.  But that was not a pre-complaint or

5   pre-indictment type of situation and it went back to the

6   last possessor.

7           The *Ramsden* case was addressed.  That's out of the

8   Ninth Circuit.  And although the court found there was no

9   irreparable harm but still found jurisdiction, that case

10  was -- did involve a callus disregard of the petitioner's

11  Fourth Amendment rights.  The government had a warrant of

12  arrest and they used that as a -- the petitioner came out

13  into the hallway and rather than arrest him there, the

14  government searched his entire -- or searched significant

15  portions of his hotel room and seized business documents.

16  The government was required to give him copies or else to

17  make copies and give him the original.  I forget which one.

18  But, again, I think that's very different than here where

19  the evidence itself, the shrapnel itself and any residues on

20  it, are so central.  And in this case there's no similar

21  callous disregard of the Fourth Amendment asserted.

22          That's all I have, Your Honor.

23          THE COURT:  Okay.  Thank you, Counsel.  The matter

24  is submitted.  Thank you, Counsel, for your arguments and

25  your knowledge of the record and careful presentation to the

1      Court of the facts as they have been established at this

2      stage in the case.  Thank you.

3          (Court adjourned at 11:55 a.m.)

4                              *      *      *

5

6

7          I, Lori A. Simpson, certify that the foregoing is a

8      correct transcript from the record of proceedings in the

9      above-entitled matter.

10

11              Certified by:  *s/ Lori A. Simpson*

12                             Lori A. Simpson, RMR-CRR

13

14

15

16

17

18

19

20

21

22

23

24

25